**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. CR15-4043-MWB |
| vs. | **REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR *FRANKS* HEARING AND MOTION TO SUPPRESS** |
| DENNIS NEIL YORGENSEN, | |
| Defendant. | |

---

## I.    INTRODUCTION

Defendant Dennis Yorgensen is charged by indictment (Doc. No. 2) with (1) conspiracy to distribute a controlled substance and (2) possession with intent to distribute methamphetamine.   He has filed a motion (Doc. No. 23) for a *Franks* hearing and to suppress all evidence obtained as a result of the search of his home and a post-arrest interview.   Plaintiff (the Government) has filed a resistance (Doc. No. 40).   The Trial Management Order (Doc. No. 16) assigns motions to suppress to me to conduct any necessary evidentiary hearings and to prepare reports on, and recommend dispositions of, those motions.

I held an evidentiary hearing on September 22, 2015.   Assistant United States Attorney Shawn Wehde appeared on behalf of the Government.   Yorgensen appeared personally and with his attorney, Assistant Federal Public Defender Brad Hansen.   The Government presented the testimony of Iowa Division of Narcotics Enforcement (DNE) Agents John Howard, Michael Mittan and Robert Jones, along with Sac County Sheriff's Deputies Jonathan Meyer and Kristan Erskine.   Yorgensen presented the testimony of Mary Sorensen and Joseph Manser.

The Government offered Government's Exhibits 1 through 7, all of which were received into evidence without objection. Yorgensen offered Defendant's Exhibits A, B-1 through B-3, C, D-1 through D-4, E, F, G, H-1 through H-3, I and J. The Government objected to Defendant's Exhibits D, J, H-2 and H-3 on grounds of relevance. I overruled those objections and admitted all Defendant's Exhibits into evidence. The motion is now fully submitted.

## II. FINDINGS OF FACT

### A. The Cast

Defendant Dennis Yorgensen resides with his wife in Odebolt, Iowa. The record reflects that he had a felony drug conviction in 2003 but no drug convictions since that time. Def. Ex. I.

Jonathan Meyer has been a law enforcement officer since 2008. He served as a police officer for the City of Ackley, Iowa, from 2008 to 2009. He then served as a police officer for the City of Missouri Valley, Iowa, from 2009 to 2012, and for the City of Denison, Iowa, from 2012 until February 2015. He became a Sac County Deputy Sheriff in February 2015, approximately one month before the night at issue in this case. Prior to that night, it had been approximately five years since Meyer drafted a search warrant application.

The record includes evidence critical of Meyer's performance in his previous positions. Def. Exs. H-1, H-2 and H-3. Of most potential concern is a "Personal Action Report" issued by the Denison Police Department on May 11, 2014. Def. Ex. H-1. That report indicates that Meyer made two arrests on May 4, 2014, but did not complete complaints and affidavits concerning the charged offenses, as required. *Id.* at 1. The report suggests some lack of candor by Meyer, as it states that he claimed he had never previously completed a complaint and affidavit for a domestic abuse charge

but also states that the Assistant Chief reviewed past domestic abuse cases in which Meyer made an arrest and completed a complaint and affidavit. *Id.* The report concludes with instructions that Meyer "pay attention to detail and not allow mistakes like these to happen again." *Id.* at 2. Meyer signed the report. *Id.* During the hearing in this case, Meyer testified that the issues described in the report related to a simple misunderstanding concerning returns of service and stated that the Denison Police Department handles those returns in a unique manner. He acknowledged, however, that the events described in the report occurred after he had been with the Denison Police Department for about two years. He also agreed that his own testimony about the situation differs from the description of events contained in the report.

Kristan Erskine has been a law enforcement officer for approximately five years. She spent two years as a Sac County Sheriff's Deputy before leaving to become a motor vehicle enforcement officer with the Iowa Department of Transportation. She held that position for about 8 months before returning to her prior position as a Sac County Sheriff's Deputy. That occurred more than two years ago. Before the events at issue here, she had written only one search warrant application.

## B.     *The Encounter*

On the evening of March 21, 2015, Meyer was on routine patrol when he was dispatched to respond to a noise complaint at an apartment building on West 2nd Street in Odebolt, Iowa. He arrived at the building at approximately 10:46 p.m. and parked in an alleyway on the building's west side. As depicted in various photographs, the building has three units on its lower level and at least one unit on a second level. *See, e.g.,* Def. Ex. B-1. When facing the building, the alley in which Meyer parked is to the right of the building.

Meyer exited his vehicle and walked east on a public sidewalk that runs parallel to the street and passes in front of the building. He walked toward the unit on the east end of the building, which was unit four, because that unit had been the alleged source of loud music. Although Meyer heard no loud music, he decided to interact with the occupants of unit four to advise them of the complaint. As he approached, but while he was still on the public sidewalk in front of the building, Meyer observed an individual (later identified as Yorgensen) standing in front of unit four with a dog. He then saw Yorgensen walk to the door of unit four, open the door and partially enter the apartment. Meyer heard Yorgensen say something to the effect that the police were there and that no one should come outside. Yorgensen then stepped back outside, shut the door, and began walking toward Meyer.

A sidewalk that is perpendicular to the public sidewalk on which Meyer was walking connects the door of unit four to the public sidewalk. The intersection of the public sidewalk and the walkway to unit four forms a "T." Yorgensen met Meyer near this intersection, while Meyer was still on the public sidewalk. Thus, Meyer never reached the sidewalk leading to unit four. Instead, his interaction with Yorgensen occurred somewhere on the public sidewalk, to the west of the "T" intersection. Depending on the precise location of the interaction, which is not exactly clear, Meyer would have been approximately 20 to 27 feet from the front door to unit four when he encountered Yorgensen.

Meyer had a brief discussion with Yorgensen. Indeed, Meyer estimated that he spoke with Yorgensen for only two or three minutes. Early in the discussion, Erskine arrived at the scene, parked on the street in front of the apartment building and approached Meyer and Yorgensen to serve as Meyer's backup. While she stood close to the two of them, she had little direct interaction with Yorgensen.

Meyer told Yorgensen that there had been a noise complaint and asked him to keep the noise down for the rest of the night. Yorgensen agreed. The only memorable aspect of the interaction is that Yorgensen's dog urinated on Erskine's boots. Erskine took this in stride and all three participants laughed about the situation. It is undisputed that the brief encounter was pleasant and non-confrontational. When it ended, Yorgensen walked back toward the entrance to unit four.

After Yorgensen walked away, Meyer asked Erskine if she had smelled marijuana. She said that she had not. Meyer, however, believed that he had. He testified that Yorgensen was "walking towards him" and was "a couple feet" from him when he first detected the scent of marijuana. He also testified that the scent quickly dissipated after he made contact with Yorgensen.

Both parties offered evidence of the weather conditions at the time of the encounter. Gov't Ex. 5; Def. Ex. G. The air temperature was in the upper 30's and the wind, if any, was very light. Gov't Ex. 5. To the extent any wind was blowing, it would have been from the southeast to the northwest, generally in the direction of a line from the door to unit four toward the location on the sidewalk at which Meyer and Yorgensen conferred. *Id.*

## C.    *The Warrant*

Neither Meyer nor Erskine walked around the building or did anything else to investigate Meyer's belief that he had smelled marijuana. Instead, they decided to meet at another location to discuss the situation. They each returned to their respective vehicles and met at the fire station in Odebolt.

During that meeting, they discussed the fact that Meyer believed he had smelled marijuana emanating from both Yorgensen and the residence while Erskine had not. They decided to contact their commanding officer, Captain Brian Erritt, to decide what,

if anything, to do next.   Meyer testified that he believed probable cause existed to request a search warrant but that Erskine wanted to contact Erritt before proceeding. Erskine placed the call and explained the situation to Erritt.   She told Erritt that while Meyer had smelled marijuana, she had not.   Erritt told them to write up a search warrant application and present it to a magistrate.

As noted above, it is undisputed that neither Meyer nor Erskine had significant experience in preparing search warrant applications. Meyer had not drafted one for approximately five years and Erskine had drafted only one in her entire career.   They ultimately prepared an application and affidavit for Meyer's signature.   Def. Ex. A. There is no evidence that Erritt or any other supervisory officer reviewed the materials before they were presented to a state court judicial magistrate.

In his affidavit, Meyer started his description of the interaction with Yorgensen by writing:   "When I exited my squad car I observed the male suspect enter the residence and re-exit the residence closing the front door."   Def. Ex. A at 3.   He then wrote the following sentence:   "When making contact with the male subject who was identified as Dennis Yorgensen, I could smell a strong odor of marijuana come from inside the residence and off Mr. Yorgensen."   *Id.*   This will be referred to herein as the Challenged Sentence.

The affidavit did not state that Erskine was also present during the interaction and, therefore, did not disclose that she did not detect the odor of marijuana.   *Id.*   Nor did the affidavit disclose that Meyer was still on the public sidewalk, at least 20 feet from the door to unit four, when he allegedly smelled a "strong odor" of marijuana emanating from both Yorgensen and the apartment.   *Id.*   Based on the information presented, the state court magistrate issued a warrant to search Yorgensen's residence.   *Id.* at 11-12.

Because of another call in a different part of Sac County, law enforcement did not execute the warrant at unit four until approximately 3:30 a.m. – nearly five hours after

the initial encounter with Yorgensen. Def. Ex. C. When the warrant was executed, only Yorgensen and his wife were present and it appeared that Yorgensen had been sleeping. Neither Meyer nor Erskine detected the odor of marijuana during the search. However, the search uncovered marijuana, methamphetamine, drug paraphernalia and over $2,700 in cash. Yorgensen was arrested and transported to the Sac County Jail.

## D.     *The Interview*

On March 24, 2015, after Yorgensen had been in custody for two days, Erritt called DNE Agent Robert Jones and told him Yorgensen wanted to talk to him. Jones then went to the Sac County Jail and interviewed Yorgensen. The entire interview was videotaped and has been received into evidence. Def. Ex. F.

At the beginning of the interview, Yorgensen asked Jones if it was true that he was going to face federal charges. When Jones confirmed this, Yorgensen began requesting information about the investigation. Jones told Yorgensen that he could not talk to him unless Yorgensen agreed to waive his Miranda rights. As the discussion continued, Yorgensen made two comments to the effect that he was thinking he needed a lawyer. Jones told Yorgensen that if he wanted a lawyer, he would get him a lawyer. However, Jones also reiterated that if Yorgensen requested a lawyer, Jones would not be able to talk to him. Ultimately, Yorgensen stated that he understood his rights and signed a Miranda waiver. Jones then conducted an interview, during which Yorgensen made incriminating statements.

Additional findings of fact will be discussed, as necessary, below.

## III.     DISCUSSION

Yorgensen argues that the affidavit in support of the warrant included a false statement and omissions that occurred knowingly and intentionally or with reckless

disregard for the truth or ability to mislead.   As a result, Yorgensen argues that the evidence obtained during the execution of the search warrant, and all statements made during his subsequent interview, must be suppressed.   In addition, and independent of his argument concerning the search warrant affidavit, Yorgensen argues that his statements during the interview must be suppressed because he asserted his right to counsel, meaning further questioning violated his constitutional rights.

The Government asserts the search warrant contained no false statements or omissions and was properly obtained based on a showing of probable cause. Additionally the Government argues that Yorgensen waived his right to counsel and that the resulting interrogation was therefore proper.   I will address Yorgensen's arguments separately.

## A.    The *Franks* Motion
### 1.    *Applicable Standards*

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."   U.S. Const. amend. IV.   Whether a warrant is supported by probable cause is a legal determination and is based on whether the warrant is supported by facts that would "justify a prudent person in the belief that there is a fair probability that contraband or evidence of a crime will be found in a particular place."   *United States v. Thurmond*, 782 F.3d 1042, 1044 (8th Cir. 2015) (quoting *United States v. Riedesel*, 987 F.2d 1383, 1390 (8th Cir. 1993)).   "A warrant issued on the basis of an affidavit that shows probable cause only because it contains a deliberate or reckless falsehood or omission violates the Fourth Amendment."   *Technical Ordnance, Inc. v. United States*, 244 F.3d 641, 647 (8th Cir. 2001) (citing *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978)); *United States v. Humphreys*, 982 F.2d 254, 258 n.2 (8th Cir. 1992).

In *Franks*, the Supreme Court stated:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

438 U.S. at 171-72 [footnote omitted]. Thus, a defendant is not automatically entitled to an evidentiary hearing to challenge statements made in a search warrant affidavit. Instead, the defendant must demonstrate the need for an evidentiary hearing by making two threshold showings: (1) the affiant knowingly, intentionally, or with reckless disregard for the truth, included a false statement in the affidavit; and (2) without this information included in the affidavit, there is no longer probable cause. *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013). To satisfy this requirement, the defendant must make a "substantial preliminary showing" comprised of specific allegations along with supporting affidavits or similarly reliable statements. *United States v. Williams*, 477 F.3d 554, 558 (8th Cir. 2007) (citing *Franks*, 438 U.S. at 171). This standard "is not lightly met." *Id.*

If a defendant makes the required showing, the court must conduct an evidentiary hearing (a *Franks* hearing). To prevail, and thus invalidate the search warrant, the defendant must make the same showings, but this time by a preponderance of the evidence. *United States v. Bausby*, 720 F.3d 652, 657 (8th Cir. 2013). With regard to alleged omissions of fact, "the defendant must show: (1) that facts were omitted with the intent to make, or in reckless disregard of whether they make, the affidavit misleading; and (2) that the affidavit, if supplemented by the omitted information, could not support a finding of probable cause." *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001) (citing *United States v. Gladney*, 48 F.3d 309, 313 (8th Cir. 1995)). "Recklessness . . . may be inferred . . . when the material omitted would have been clearly critical to the finding of probable cause." *United States v. Conant*, ___ F.3d ___, 2015 WL 5023715, at *2 (8th Cir. June 11, 2015) (citing *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011)).

### 2.      *Analysis*

As noted above, there are two steps to a *Franks* analysis. I first must consider whether Yorgensen made the substantial preliminary showing necessary to require an evidentiary hearing. If so, I must determine whether the evidence presented at that hearing establishes the elements of a *Franks* violation by a preponderance of the evidence. Here, with the parties' consent, I reserved ruling as to the first step and allowed the parties to present all of their evidence at the hearing.[1]

---

[1] I scheduled the hearing without addressing the question of whether Yorgensen made the necessary threshold showing because his motion to suppress includes an argument that is independent of the *Franks* issue. At the beginning of the hearing, counsel for both parties agreed that they would present all evidence, including evidence concerning the *Franks* issues, with the understanding that I will address both steps in the *Franks* analysis.

The Government acknowledges that probable cause to support the search warrant would have been lacking without the Challenged Sentence, as the remaining facts in the affidavit would not have established probable cause. Thus, I need only examine the first element of a *Franks* claim: Did Meyer knowingly, intentionally, or with reckless disregard for the truth, include false statements or material omissions in the affidavit?

### a. *Did Yorgensen Make the Necessary Preliminary Showing?*

In support of his request for a *Franks* hearing, Yorgensen submitted his own affidavit, two affidavits from investigator Joseph Manser and the affidavits of Mary Sorensen and Roger Sorensen. Def. Exs. D-1, D-2, D-3, D-4, J. The Sorensen affidavits attested that they witnessed the interaction between Yorgensen, Meyer and Erskine from their home across the street and that, in their opinion, the law enforcement officers at the scene were never close enough to Yorgensen's apartment to detect any odors emanating from it. Def. Exs. D-1, D-2. Yorgensen's affidavit stated a similar opinion and further indicated that Yorgensen had closed both the interior door and the screen door when he left unit four. Def. Ex. D-3.

Manser's initial affidavit indicated that based on the Sorensens' observations, the interaction occurred over 27 feet away from the front door to unit four. Def. Ex. D-4. His supplemental affidavit revealed he had spoken with Erskine and that she had acknowledged that she did not smell marijuana coming from either Yorgensen or his residence during the interaction. Def. Ex. J.

Yorgensen also submitted photographs of the scene and evidence that there was little, if any, wind at the time of the encounter. Def. Ex. G. Finally, Yorgensen submitted evidence concerning Meyer's disciplinary history, including a 2010 reprimand for poor report writing and the above-mentioned report from the Denison Police Department suggesting a lack of candor on Meyer's part. Def. Exs. H-1, H-2 and H-

3.  In combination, I find that this evidence rather easily satisfied the "substantial preliminary showing" requirement.

As noted above, the Challenged Sentence includes Meyer's statement that upon making contact with Yorgensen, he could "smell a strong odor of marijuana" coming from both "inside the residence" and "off Mr. Yorgensen." Def. Ex. A at 3. The evidence Yorgensen submitted with his motion indicates that Meyer was a substantial distance from the door to unit four at the time of the encounter, that Erskine did not smell marijuana, that there was little or no wind and that the door to unit four was closed. These propositions, if true, cast substantial doubt on Meyer's claim that he was able to detect the "strong" odor of marijuana from both Yorgensen himself, with whom he was in "contact" with, and emanating from the more-distant apartment.

The evidence Yorgensen submitted in support of his request for a *Franks* hearing is more substantial and persuasive than that presented in other cases in this circuit in which defendants have challenged claims of scent detection. In *United States v. Richey*, 185 Fed. Appx. 539 (8th Cir. 2006), the defendant alleged that the search warrant affiant could not have detected the odor of ether because (1) the wind was blowing away from the officer and (2) an odor filtration system was installed in the home. *Id.* at 539-40. The officer, who had investigated approximately 100 methamphetamine lab cases, testified that he detected the odor while driving past the residence and then exited his vehicle to approach the residence and confirm the odor. *Id.* at 540. Two other officers provided corroborating testimony. *Id.* Indeed, they testified to the effect that "the ether odor was so strong that the officers cleared the house, opened all of the windows, and ventilated the house with industrial exhaust fans before they conducted the search." *Id.* Here, by contrast, there is no corroborating evidence. Indeed, Yorgensen presented evidence that Erskine – the only other officer at the scene – did not smell marijuana.

In *United States v. Haines*, 94 Fed. Appx. 422 (8th Cir. 2004), police received a report that a person driving a motorcycle registered to the defendant had purchased a large quantity of pseudoephedrine, a methamphetamine precursor. *Id.* at 424. An officer drove by the defendant's resistance, observed the motorcycle in the front yard and "got a strong smell of ether," an odor associated with the manufacture of methamphetamine. *Id.* A search warrant was issued based on an affidavit containing this information. *Id.* No ether was found, but officers located a sawed-off shotgun and charged the defendant with possession of an unregistered firearm. *Id.* The defendant claimed a *Franks* violation due to the direction of the wind and the fact that no ether was found. *Id.* at 424-25. The Eighth Circuit agreed with the district court that "the mere fact that the Iowa City weather service provided different information than the wind information provided by police radio dispatch was insufficient to make a substantial showing that the officer affirmatively misled the court or recklessly disregarded the truth of whether or not he smelled ether." *Id.* at 425. In other words, a weather report and the ex post facto lack of ether on the property did not constitute a substantial preliminary showing so as to require an evidentiary hearing.

For the reasons set forth above, I find that the evidence Yorgensen submitted went well beyond the evidence deemed insufficient in *Richey* and *Haines* and satisfied Yorgensen's burden to make a substantial preliminary showing.[2] The next issue, then, is whether Yorgensen met his burden of establishing a *Franks* violation by a preponderance of the evidence.

---

[2] While I am basing this finding solely on the evidence Yorgensen submitted before the hearing, I note that the evidence presented during the hearing, as discussed below, further enhances Yorgensen's argument that a *Franks* hearing was appropriate.

### b. Has Yorgensen Established a <u>Franks</u> Violation?

As noted above, Yorgensen argues that in the Challenged Sentence, Meyer knowingly, intentionally, or with reckless disregard for the truth, included a false statement concerning the "strong" smell of marijuana emanating from both unit four and from Yorgensen. In addition, based on evidence presented during the hearing, Yorgensen argues that Meyer's affidavit intentionally or recklessly omitted material facts that should have been disclosed to the magistrate, including Meyer's distance from the door to unit four and the fact that Erskine did not smell marijuana from any source. Yorgensen argues that probable cause to support issuance of a search warrant would have been lacking if the Challenged Sentence was excised and/or if the omitted information was included. Thus, he contends that the warrant should be declared invalid.

The Government argues that Yorgensen has not met his burden of showing by a preponderance of the evidence that Meyer's affidavit contained false statements or material omissions. For the reasons set forth below, however, I disagree. Based on the evidence presented, I find that the affidavit included a combination of incorrect statements and material omissions, made recklessly, so as to render it misleading.

For starters, Meyer's claim in the affidavit that he "could smell a strong odor of marijuana come from inside the residence and off [Yorgensen]" is simply not supported by the evidence. Indeed, Meyer's own testimony demonstrates that this statement was, at least, misleading. He testified that he smelled a "strong" odor only momentarily. He acknowledged that this smell then dissipated quickly after he made contact with Yorgensen – a fact that he did not include in his affidavit. Meyer further stated that the odor of marijuana on Yorgensen himself was not as strong as the brief whiff he allegedly detected from the apartment. Again, this is contrary to his affidavit, which described a "strong odor" coming from both Yorgensen and the apartment.

14

Meyer offered no plausible explanation as to how he was able to differentiate between an odor coming from a briefly-opened apartment door – over 20 feet away – from the same odor coming from a person with whom he was in "contact." While I do not doubt that Meyer smelled marijuana from some source, I find that the evidence does not support Meyer's statement in the affidavit that he was able to detect that smell from two different sources. I further find that Meyer's description of the odor as being "strong" is unsupported by the evidence. While Meyer represented to the issuing magistrate that this "strong" odor emanated from both Yorgensen and the apartment, Erskine smelled no such odor at all – despite being directly adjacent to Meyer.

In short, I find that the Challenged Sentence, as written by Meyer, was untrue.[3] I also find that the affidavit contained two important omissions that further caused it to be terribly misleading. First, neither Meyer nor the Government offered any meaningful explanation of the decision to omit the fact that Erskine did not detect the smell of marijuana while she was at the scene with Meyer. Erskine and Meyer clearly considered this to be important to the probable cause determination, as they called Erritt

---

[3] The Government presented testimony from two law enforcement officers in an attempt to bolster Meyer's claim that he was able to smell marijuana from the briefly-opened apartment door, at least 20 feet away. Agent John Howard testified about a situation in which he was able to detect the smell of marijuana from approximately 20 feet through an open window when five individuals inside the structure were smoking marijuana. I do not doubt Howard's testimony but find that the situations are not analogous. In Howard's situation, the window was open continuously and he was not adjacent to a suspect who was also emitting the strong odor of marijuana. Agent Mike Mittan testified as an expert concerning the unique, highly-identifiable properties of marijuana's odor. When presented with hypothetical scenarios similar to the situation Meyer encountered, however, Mittan could only say that the ability to detect the odor would be highly dependent on all of the circumstances, including weather conditions. Mittan acknowledged that he could not say whether an officer would be able to distinguish an odor of marijuana emanating from a nearby suspect from the same odor coming from a more-distant residence. In short, while I found both of the Government's witness on this issue to be credible, I also find that their testimony does not resolve the factual flaws in the Challenged Sentence.

and sought his guidance as to whether probable cause existed despite the fact that Erskine did not smell marijuana. Erritt's decision that they should proceed with a search warrant application did not excuse them from providing the same information to the magistrate. It is not the duty of a law enforcement officer to make a probable cause determination, but for a magistrate to evaluate the "crucial information" provided by law enforcement in determining whether probable cause exists to issue a warrant. *Illinois v. Gates*, 462 U.S. 213, 283 (2012). As written, the affidavit does not even disclose that another officer was present with Meyer, let alone that she did not smell marijuana.

Second, the affidavit did not disclose Meyer's distance from the door to unit four when he allegedly smelled a "strong odor" of marijuana coming from the apartment. It is undisputed that Meyer was at least 20 feet away (and possibly farther) and that he was much closer to Yorgensen. As written, the affidavit creates the impression that the encounter occurred near the door. Meyer wrote that he saw Yorgensen "enter the residence and re-exit the residence closing the front door." Def. Ex. A at 3. In the next sentence, which is the Challenged Sentence, Meyer described the "strong odor" that he detected when "making contact" with Yorgensen. Meyer did not mention the fact that Yorgensen walked the entire length of the sidewalk connecting unit four to the public sidewalk, thus causing Meyer's "contact" with Yorgensen to occur on the public sidewalk rather than in close proximity to the front door.

The distance at which Meyer stood and the failure of Erskine to detect the scent of marijuana was "crucial information" for an informed determination of whether probable cause existed to issue a search warrant. *See, e.g.*, *United States v. Bearden*, 780 F.3d 887, 894 (8th Cir. 2015) (two officers detected the scent of marijuana and upon returning later that day to make contact with the occupant at his door noticed the scent was stronger); *United States v. Wells*, 648 F.3d 671, 673-74 (8th Cir. 2011) (two officers standing on the porch detected the "strong odor" of burnt marijuana immediately after

the door was opened); *United States v. Yarbrough*, 272 Fed. Appx. 438, 443 (6th Cir. 2007) (while only one of the three officers at the scene testified to the smell of marijuana outside the residence, the other two did not testify to the lack of any such smell but, instead, were never asked); *United States v. Charles*, 29 Fed. Appx. 892, 898 (3d Cir. 2002) (probable cause to issue a warrant existed when, standing on the porch, officers detected the scent of growing marijuana immediately after defendant opened his front door).   As a judicial officer who routinely reviews search warrant applications, I would find it highly relevant that the officer who allegedly smelled a "strong odor" from both a suspect and a residence was over 20 feet from the door to the residence at the time.   I would also find it highly relevant that a fellow officer, standing at nearly the same location, did not detect the odor from any source.   I have no difficulty in finding that these were material omissions that should have been included in the affidavit.

Of course, my finding that the Challenged Sentence was untrue, and that material information was omitted from the affidavit, does not end the analysis.   I must also consider whether Meyer acted knowingly, intentionally or with reckless disregard for the truth.   *Arnold*, 725 F.3d at 898.   While I do not find that Meyer acted knowingly or intentionally, I do find that he acted with reckless disregard for the truth.   As noted above, the Challenged Sentence is not consistent with Meyer's own testimony about what he observed and smelled during the brief encounter.   Moreover, the omitted information was of a highly-material nature, such that it almost surely would have impacted the probable cause determination and, at minimum, prompted the magistrate to request additional information.[4]   "Recklessness . . . may be inferred . . . when the material

---

[4] Of course, an issuing magistrate is not required to ask additional questions and may rely solely on the information "found within the four corners of the affidavit." *United States v. Solomon*, 432 F.3d 824, 829 (8th Cir. 2005) (quoting *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999)).   However, the omissions here deprived the magistrate of the opportunity to request

omitted would have been clearly critical to the finding of probable cause." *Conant*, ___
F.3d at ___, 2015 WL 5023715, at *3. I find this inference to be applicable here.

In finding that Meyer acted recklessly, but not intentionally, I am taking into account the fact that both he and Erskine had little experience in preparing search warrant applications. With more experience and proper training, they likely would have understood that withholding critical information is not appropriate. Similarly, if Erritt or another experienced officer would have reviewed the application before it was presented to the magistrate, the misstatements and omissions may have been corrected. Unfortunately, that did not happen. As such, the issuing magistrate was presented with an affidavit in which the most-critical sentence was incorrect and two items of highly-relevant information were omitted. I find that these flaws resulted from a reckless disregard for the truth and caused the affidavit to be materially misleading.[5]

This finding establishes the first element of a *Franks* violation. Because the Government does not dispute the second element (i.e., excising the Challenged Sentence would eliminate probable cause), I must recommend that the search warrant be declared invalid and that all evidence seized during the execution of the warrant be suppressed.[6]

---

additional information.

[5] In making this finding, I have given some weight to evidence concerning Meyer's disciplinary record, particularly the Denison Police Department report. Def. Ex. H-1. As I noted earlier, that report suggests that Meyer was less than fully candid with his supervisor. Moreover, I am troubled by the fact that Meyer's testimony about the situation differs sharply from the facts described in the report. While Meyer blamed the situation on procedures with which he was allegedly unfamiliar, he had been with the Denison Police Department for approximately two years at the time of the events described in the report and, according to the report, had successfully complied with those procedures in the past. Def. Ex. H-1. Neither the report itself nor Meyer's testimony about the situation reflects favorably on his credibility.

[6] For good reason, the Government does not argue for application of the good-faith exception to the exclusionary rule recognized in *United States v. Leon*, 468 U.S. 897 (1984). That exception

*B.*     *The Motion to Suppress Post-Arrest Statements*

Yorgensen raises two arguments in support of his motion to suppress statements he made during his post-arrest interview with Agent Jones.   First, he contends that because of the *Franks* violation, those statements were the fruits of an illegal search and seizure.   Second, and in the alternative, Yorgensen argues that the interview was conducted in violation of his right to counsel and all questioning should have ceased when Yorgensen mentioned an attorney.

The Government resists both arguments.   As to the first, the Government argues that Yorgensen's post-arrest statements were so attenuated from the allegedly-illegal search so as to dissipate any taint.   With regard to the second, the Government argues that Yorgensen voluntarily waived his right to counsel and that Jones was therefore entitled to proceed with the interview.   I will address each argument separately.


*1.*     *Fruits of the Illegal Search*

*a.*     *Applicable Standards*

In *Franks,* the Supreme Court stated:

> In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, <u>the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.</u>

---

does not apply if the "defendant makes a substantial showing that the affiant intentionally or recklessly misstated or omitted facts." *United States v. Ryan*, 293 F.3d 1059, 1062 (8th Cir. 2002) (quoting *United States v. Gipp*, 147 F.3d 680, 688 (8th Cir. 1998)).

*Franks*, 738 U.S. at 156 [emphasis added]. "[T]he exclusionary rule … prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). Thus, evidence derived through police illegality will still be admissible "if the causal connection between the constitutional violation and the discovery of the evidence has become so attenuated as to dissipate the taint." *United States v. Wipf*, 397 F.3d 677, 684 (8th Cir. 2005) (citing *Hamilton v. Nix*, 809 F.2d 463, 465 (8th Cir. 1987) (en banc) (in turn citing *United States v. Ceccolini*, 435 U.S. 268, 273–80 (1978)).

### b.    Analysis

Because I have found the search warrant to be unlawful, Yorgensen's arrest was likewise unlawful, as it is undisputed that it was based on evidence gathered during the search. In determining whether a post-arrest statement retains the taint of an illegal arrest, a court must consider four factors: (1) the giving of Miranda warnings; (2) the temporal proximity of the illegality and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *United States v. Tovar*, 687 F.2d 1210, 1215 (8th Cir. 1982) (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)); *see also U.S. v. Moreno*, 280 F.3d 898, 900 (8th Cir. 2002).

Here, Yorgensen was in custody continuously between his arrest during the early morning hours of March 22, 2015, and his discussion with Jones on March 24, 2015. While the Government argues that this passage of two days dissipated any potential taint, I disagree. The Government presented no evidence that Yorgensen would have been in custody on March 24, 2015, for any independent, lawful reason. Nor did the

Government present evidence that Yorgensen voluntarily would have sought to speak with Jones even if Yorgensen had not been in custody. The fact that Yorgensen spent two days in custody is simply irrelevant to the analysis. The interview between Jones and Yorgensen would not have occurred but for the illegal search of Yorgensen's home and the resulting, illegal arrest. *See, e.g.*, *United States v. Carter*, 884 F.2d 368, 374 (8th Cir. 1989) (confession came as a direct result of an illegal search and as such must be suppressed as a fruit of the fourth amendment violation).[7]

The fact that Jones gave Yorgensen a Miranda warning did not purge the taint of the illegal search. *See, e.g.*, *Oregon v. Elstad*, 470 U.S. 298, 337 (1985) ("Nor have we ever allowed Miranda warnings alone to serve talismanically to purge the taint of prior illegalities"). Had Yorgensen been released, and later returned voluntarily to speak with law enforcement, the situation would be different. *Wong Sun v. United States*, 371 U.S. 471, 491 (1963) (defendant's release and subsequent voluntary return to police station dissipated taint); *United States v. Black Bear*, 422 F.3d 658, 664 (8th Cir. 2005) (statements admissible where defendant was not in police custody during the 24 hours between the unwarned initial statement and the subsequent Miranda warning for the second interrogation). Here, however, Yorgensen was in custody continuously between the time of his arrest and the time of the interview. Because the arrest was unlawful, the fact that Yorgensen received a Miranda warning did not purge the taint of the unlawful conduct.

There is no evidence of any intervening circumstances. As for the purpose and flagrancy of the official misconduct, I have already determined that false statements and

---

[7] To be clear, Jones did absolutely nothing wrong in traveling to the jail to interview Yorgensen. It is undisputed that Jones was told by Erritt that Yorgensen wanted to speak with him. Jones had no role in the unlawful search and, therefore, no reason to doubt that Yorgensen was lawfully in custody.

material omissions were recklessly made for the purpose of securing a search warrant. Having considered the relevant factors, I find no support for the Government's argument that the taint of the illegal search and arrest had dissipated by the time Yorgensen was interviewed. As such, I must recommend that the statements Yorgensen made to Agent Jones be suppressed as the fruits of an unlawful search and seizure.

## 2. Invocation of the Right to Counsel

Alternatively, Yorgensen contends that his post-arrest statements must be suppressed because they occurred after he invoked his right to counsel. I will address this argument for the benefit of the district court in the event that my finding of a *Franks* violation is not adopted.

### a. Applicable Standards

A suspect in custody must be advised as follows:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If a suspect requests an attorney, then questioning must cease until a lawyer has been made available or the suspect initiates the conversation. *Dormire v. Wilkinson*, 249 F.3d 801, 804 (8th Cir. 2001) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)). However, "[o]fficers are only required to cease questioning if a suspect's request for an attorney is clear and unambiguous." *United States v. Mohr*, 772 F.3d 1143, 1145 (8th Cir. 2014).

A suspect may waive his or her Miranda rights if the waiver is made voluntarily, knowingly and intelligently. *Miranda*, 384 U.S. at 444. "[A] waiver is 'voluntary'

where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception." *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005). "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right." *Id.* The government "need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

### b.    *Analysis*

My consideration of this issue is aided substantially by the fact that an audio and video recording was made of the entire exchange between Yorgensen and Jones. Def. Ex. F. The relevant portion of the conversation is as follows:

| | |
|---|---|
| Jones: | Here's what we'll do if you want to and like I said whenever you want to you can say hey, I want to go back to my cell. Okay, we're not holding you here, I'm not . . . you know, okay? |
| Yorgensen: | Right, right, right, right. |
| Jones: | Here's what we'll do. I'm going to go ahead and Mirandize you, okay 'cuz I need . . . I need to make sure you fully understand your rights. |
| Yorgensen: | I think [unintelligible] I do need a lawyer. |
| Jones: | Okay, that . . . that's cool. If you . . . you . . . |
| Yorgensen: | I mean you're getting to this point man. I'm thinking . . . I'm thinking I really need a lawyer. |
| Jones: | Then if you're saying if you want if listen, if you're saying you want a lawyer then I can't talk to you. |

| Yorgensen: | Oh, okay. Well then |
| Jones: | But I'm not, listen . . . listen . . . listen, I'm not trying to change your mind on that. If you want a lawyer, we'll get you a lawyer. |
| Yorgensen: | But like you said, I can always . . . I can always quit talking. |
| Jones: | Exactly. |
| Yorgensen: | No, let's see what you got. |

*Id.* Jones then read Yorgensen his *Miranda* rights and Yorgensen confirmed that he understood them. Yorgensen also signed a written waiver of those rights. Jones then conducted an interview, during which Yorgensen made some incriminating statements.

Yorgensen contends that his two comments about a lawyer ("I think . . . I do need a lawyer" and "I'm thinking I really need a lawyer") constituted a request for counsel such that Jones should have stopped the interview and left the room. However, only a "clear and unequivocal request for the assistance of counsel may serve to invoke a defendant's right." *United States v. Cloud*, 594 F.3d 1042, 1046 (8th Cir. 2010) (quoting *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003)). Officers are allowed, and in fact encouraged, to ask clarifying questions if there is an ambiguous request for an attorney. *Davis v. United States*, 512 U.S. 452, 459-61 (1994). Based on my repeated review of the relevant portion of Yorgensen's discussion with Jones, I find it to be rather obvious that Yorgensen failed to express a clear and unequivocal request for counsel. Instead, after Yorgensen made his comments about a lawyer, Jones properly asked clarifying questions as to whether Yorgensen was, in fact, invoking his right to counsel. Jones did not try to talk Yorgensen out of requesting an attorney. Indeed, he stated: "I'm not trying to change your mind on that. If you want a lawyer,

we'll get you a lawyer." Jones simply, and truthfully, advised Yorgensen that if he requested a lawyer, Jones could not talk to him.

In arguing that Jones should have immediately stopped the discussion, Yorgensen relies on various cases finding a clear and unequivocal request for the assistance of counsel under circumstances Yorgensen finds analogous. Doc. No. 23-1 at 14. For example, in *Smith v. Illinois*, 469 U.S. 91 (1984), the defendant stated: "Uh, yeah, I'd like to do that," upon being told of his right to have an attorney. *Id.* at 93. The Supreme Court held that this statement, alone, was clear and unequivocal, meaning no clarifying questions were necessary or appropriate. *Id.* at 99. The Court stated:

> Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease. In these circumstances, an accused's subsequent statements are relevant only to the question whether the accused waived the right he had invoked. Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.

*Id.* Here, Yorgensen did not declare in uncertain terms that he wanted to have counsel. Instead, he stating that he was "thinking" he needed a lawyer. I find that the words he used, along with the circumstances leading up to his utterance of those words, fell short of unqualified statement at issue in *Smith*.

Because Yorgensen used the words "think" and "thinking," he also relies on *Cannady v. Duggar*, 931 F.2d 752 (11th Cir. 1991), a case in which the defendant stated: "I think I should call my lawyer." *Id.* at 754. The court noted that the interrogating officer clearly understood this to be a request for counsel, as he pushed a telephone toward the defendant so he could make the call. *Id.* at 755. Moreover, to the extent that the defendant's subsequent failure to place a call created any uncertainty, the officer did not ask any questions to clarify whether the defendant wanted to call his attorney. *Id.* Instead, he asked the defendant if he wanted "to talk about it." *Id.* Only then did

the defendant make an incriminating statement.  *Id.*   The court held that the statement must be excluded because the officer should have stopped questioning the defendant about the crime once the defendant stated a desire to call his attorney.  *Id.*

Importantly, however, the court noted that a request for counsel would be equivocal if the defendant expressed a desire to both have counsel and continue the discussion with law enforcement.  *Id.*   That is similar to what happened here.   From the beginning of his discussion with Jones, Yorgensen requested information about federal charges and expressed a desire to talk with Jones.   His comments that he was thinking he needed a lawyer were made after he expressed an understanding that his situation would be dire if federal charges were filed.   However, he also made it quite clear that he wanted information from Jones.   Once Jones stated that the discussion could not continue if Yorgensen asked for an attorney, Yorgensen stated "I can always quit talking" and "let's see what you got."   The context of Yorgensen's comments about a lawyer rendered those comments more equivocal than the statement made in *Cannady*. Jones was entitled to ask clarifying questions without violating Yorgensen's right to counsel.

I find that Yorgensen did not clearly and unequivocally invoke his right to an attorney.   Any incriminating statements made by Yorgensen during the interview were made after he was advised of his Miranda rights and waived them in writing.   As such, if the district court declines to adopt my *Franks* analysis, I recommend that Yorgensen's motion to suppress his post-arrest statements be denied.

## IV.    CONCLUSION

For the foregoing reasons, I RESPECTFULLY RECOMMEND that defendant Dennis Yorgensen's motion (Doc. No. 23) for *Franks* hearing and motion to suppress be

**granted** and that all evidence gathered during both (a) the execution of the search warrant at issue and (b) the post-arrest interview of Yorgensen be **suppressed**.

Objections to this Report and Recommendation in accordance with 28 U.S.C. §636(b)(1) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 2nd day of October, 2015.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE