**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

DENNIS NEIL YORGENSEN,

          Defendant.

No. CR15-4043-MWB


**MEMORANDUM OPINION AND
ORDER REGARDING
MAGISTRATE'S REPORT AND
RECOMMENDATION ON
DEFENDANT'S MOTION FOR
*FRANKS* HEARING AND MOTION
TO SUPPRESS**

_____

**TABLE OF CONTENTS**

I.     **INTRODUCTION AND BACKGROUND**............................................... 2
    A.    *Procedural Background* ............................................................. 2
    B.    *Factual Background* ................................................................. 4
II.    **LEGAL ANALYSIS** ...................................................................... 10
    A.    *Standards Of Review* ............................................................... 10
    B.    *The Prosecution's Objection* ..................................................... 15
         1.    *Miranda warnings* ......................................................... 17
         2.    *Temporal proximity* ....................................................... 18
         3.    *Presence of intervening circumstances* ............................... 19
         4.    *Purpose and flagrancy of official misconduct* ...................... 21
    C.    *Yorgensen's Objection* ............................................................ 22
III.    **CONCLUSION** .......................................................................... 26

# I.    INTRODUCTION AND BACKGROUND

## A.    Procedural Background

This case is before me on United States Magistrate Judge Leonard T. Strand's Report And Recommendation on defendant Dennis Neil Yorgensen's Motion for *Franks* Hearing and Motion to Suppress (docket no. 48).  In his Report And Recommendation, Judge Strand recommends granting Yorgensen's motion and suppressing all evidence seized during the execution of a search warrant as well as statements Yorgensen made to a law enforcement officer.  Both parties have filed timely objections to Judge Strand's Report and Recommendation.  I, therefore, undertake the necessary review of Judge Strand's Report and Recommendation.

On July 23, 2015, an indictment was returned charging Yorgensen with conspiracy to distribute 50 grams or more of a methamphetamine mixture which contained 5 grams or more of pure methamphetamine (Count 1), in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846, and possessing with the intent to distribute a methamphetamine mixture which contained 5 grams or more of pure methamphetamine (Count 2), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).

Yorgensen subsequently filed a Motion for *Franks* Hearing and Motion to Suppress (docket no. 23) in which seeks to suppress all evidence obtained as a result of the search of his apartment and a post-arrest interview.  Yorgensen contends that a search warrant issued for his home was invalid because Sac County Deputy Sheriff Jonathan Meyer's affidavit in support of the warrant included a false statement and omissions that were made either knowingly and intentionally, or with reckless disregard for the truth. Yorgensen also argues that his post-arrest statements must be suppressed on grounds that they were the fruit of the poisonous tree.  Yorgensen also argues, in the alternative, that

his interview was conducted in violation of his right to counsel and all questioning should have ceased because he requested an attorney.

The prosecution filed a timely resistance to Yorgensen's motion. Yorgensen's motion was referred to United States Magistrate Judge Leonard T. Strand, pursuant to 28 U.S.C. § 636(b). Judge Strand conducted an evidentiary hearing and then filed a Report and Recommendation in which he recommends that Yorgensen's motion be granted and I suppress all evidence obtained as a result of the search of Yorgensen's apartment and a post-arrest interview. In his Report and Recommendation, Judge Strand initially concluded that Yorgensen made the substantial preliminary showing necessary to require an evidentiary hearing. Next, Judge Strand determined that Yorgensen met his burden of establishing a *Franks* violation by a preponderance of the evidence. Judge Strand based this conclusion on his finding that Meyer's "affidavit included a combination of incorrect statements and material omissions, made recklessly, so as to render it misleading." Report and Recommendation at 14. Specifically, Judge Strand found that Meyer's statement that he "'could smell a strong odor of marijuana come from inside the residence and off [Yorgensen]'" was not supported by the evidence and was "at least, misleading." Report and Recommendation at 14. Judge Strand based this conclusion, in part, on the fact that Sac County Deputy Sheriff Kristan Erskine did not smell anything "despite being directly adjacent to Meyer." Report and Recommendation at 15. Judge Strand further noted that Meyer's affidavit contained two "important omissions" that caused it to be "terribly misleading." Report and Recommendation at 15. First, Meyer omitted the fact that Erskine did not detect the smell of marijuana while she was at the scene with Meyer. Second, Meyer's affidavit did not disclose that Meyer was at least 20 feet away from the door to Yorgensen's apartment when he allegedly smelled a "strong odor" of marijuana coming from the apartment. Judge Strand further concluded that Meyer "acted with reckless disregard for the truth" which caused his affidavit to be

"materially misleading." Report and Recommendation at 17-18. As a result, Judge Strand recommended that "the search warrant be declared invalid and that all evidence seized during the execution of the warrant be suppressed." Report and Recommendation at 18. Finally, Judge Strand found that the taint of the illegal search and arrest had not dissipated by the time Yorgensen was interviewed by Iowa Division of Narcotics Enforcement Agent Robert Jones and, therefore, Yorgensen's statements to Jones were required to be suppressed as the fruits of an unlawful search and seizure.

Alternatively, Judge Strand addressed Yorgensen's claim that his post-arrest statements must be suppressed because they occurred after he invoked his right to counsel. Judge Strand rejected this clam because Yorgensen failed to make a clear and unequivocal request for counsel.

Both the prosecution and Yorgensen have filed objections to Judge Strand's Report and Recommendation. Both parties, in turn, filed timely responses to the other's objections. The prosecution also filed a Motion for Reconsideration of Report and Recommendation (docket no. 54). Judge Strand denied the prosecution's motion to reconsider. The prosecution has also filed objections to that order. I, therefore, undertake the necessary review of Judge Strand's recommended disposition of Yorgensen's Motion for *Franks* Hearing and Motion to Suppress.

## B.    *Factual Background*

In his Report and Recommendation, Judge Strand made the following factual findings:

### A.  The Cast

Defendant Dennis Yorgensen resides with his wife in Odebolt, Iowa. The record reflects that he had a felony drug

conviction in 2003 but no drug convictions since that time. Def. Ex. I.

Jonathan Meyer has been a law enforcement officer since 2008. He served as a police officer for the City of Ackley, Iowa, from 2008 to 2009. He then served as a police officer for the City of Missouri Valley, Iowa, from 2009 to 2012, and for the City of Denison, Iowa, from 2012 until February 2015. He became a Sac County Deputy Sheriff in February 2015, approximately one month before the night at issue in this case. Prior to that night, it had been approximately five years since Meyer drafted a search warrant application.

The record includes evidence critical of Meyer's performance in his previous positions. Def. Exs. H-1, H-2 and H-3. Of most potential concern is a "Personal Action Report" issued by the Denison Police Department on May 11, 2014. Def. Ex. H-1. That report indicates that Meyer made two arrests on May 4, 2014, but did not complete complaints and affidavits concerning the charged offenses, as required. *Id*. at 1. The report suggests some lack of candor by Meyer, as it states that he claimed he had never previously completed a complaint and affidavit for a domestic abuse charge but also states that the Assistant Chief reviewed past domestic abuse cases in which Meyer made an arrest and completed a complaint and affidavit. *Id*. The report concludes with instructions that Meyer "pay attention to detail and not allow mistakes like these to happen again." *Id*. at 2. Meyer signed the report. *Id*. During the hearing in this case, Meyer testified that the issues described in the report related to a simple misunderstanding concerning returns of service and stated that the Denison Police Department handles those returns in a unique manner. He acknowledged, however, that the events described in the report occurred after he had been with the Denison Police Department for about two years. He

also agreed that his own testimony about the situation differs from the description of events contained in the report.

Kristan Erskine has been a law enforcement officer for approximately five years. She spent two years as a Sac County Sheriff's Deputy before leaving to become a motor vehicle enforcement officer with the Iowa Department of Transportation. She held that position for about 8 months before returning to her prior position as a Sac County Sheriff's Deputy. That occurred more than two years ago. Before the events at issue here, she had written only one search warrant application.

## B. The Encounter

On the evening of March 21, 2015, Meyer was on routine patrol when he was dispatched to respond to a noise complaint at an apartment building on West 2nd Street in Odebolt, Iowa. He arrived at the building at approximately 10:46 p.m. and parked in an alleyway on the building's west side. As depicted in various photographs, the building has three units on its lower level and at least one unit on a second level. *See, e.g.,* Def. Ex. B-1. When facing the building, the alley in which Meyer parked is to the right of the building.

Meyer exited his vehicle and walked east on a public sidewalk that runs parallel to the street and passes in front of the building. He walked toward the unit on the east end of the building, which was unit four, because that unit had been the alleged source of loud music. Although Meyer heard no loud music, he decided to interact with the occupants of unit four to advise them of the complaint. As he approached, but while he was still on the public sidewalk in front of the building, Meyer observed an individual (later identified as Yorgensen) standing in front of unit four with a dog. He then saw Yorgensen walk to the door of unit four, open the door and partially enter the apartment. Meyer heard Yorgensen say

6

something to the effect that the police were there and that no one should come outside. Yorgensen then stepped back outside, shut the door, and began walking toward Meyer.

A sidewalk that is perpendicular to the public sidewalk on which Meyer was walking connects the door of unit four to the public sidewalk. The intersection of the public sidewalk and the walkway to unit four forms a "T." Yorgensen met Meyer near this intersection, while Meyer was still on the public sidewalk. Thus, Meyer never reached the sidewalk leading to unit four. Instead, his interaction with Yorgensen occurred somewhere on the public sidewalk, to the west of the "T" intersection. Depending on the precise location of the interaction, which is not exactly clear, Meyer would have been approximately 20 to 27 feet from the front door to unit four when he encountered Yorgensen.

Meyer had a brief discussion with Yorgensen. Indeed, Meyer estimated that he spoke with Yorgensen for only two or three minutes. Early in the discussion, Erskine arrived at the scene, parked on the street in front of the apartment building and approached Meyer and Yorgensen to serve as Meyer's backup. While she stood close to the two of them, she had little direct interaction with Yorgensen.

Meyer told Yorgensen that there had been a noise complaint and asked him to keep the noise down for the rest of the night. Yorgensen agreed. The only memorable aspect of the interaction is that Yorgensen's dog urinated on Erskine's boots. Erskine took this in stride and all three participants laughed about the situation. It is undisputed that the brief encounter was pleasant and non-confrontational. When it ended, Yorgensen walked back toward the entrance to unit four.

After Yorgensen walked away, Meyer asked Erskine if she had smelled marijuana. She said that she had not. Meyer, however, believed that he had. He testified that

Yorgensen was "walking towards him" and was "a couple feet" from him when he first detected the scent of marijuana. He also testified that the scent quickly dissipated after he made contact with Yorgensen.

Both parties offered evidence of the weather conditions at the time of the encounter. Gov't Ex. 5; Def. Ex. G. The air temperature was in the upper 30's and the wind, if any, was very light. Gov't Ex. 5. To the extent any wind was blowing, it would have been from the southeast to the northwest, generally in the direction of a line from the door to unit four toward the location on the sidewalk at which Meyer and Yorgensen conferred. *Id.*

### C. The Warrant

Neither Meyer nor Erskine walked around the building or did anything else to investigate Meyer's belief that he had smelled marijuana. Instead, they decided to meet at another location to discuss the situation. They each returned to their respective vehicles and met at the fire station in Odebolt.

During that meeting, they discussed the fact that Meyer believed he had smelled marijuana emanating from both Yorgensen and the residence while Erskine had not. They decided to contact their commanding officer, Captain Brian Erritt, to decide what if anything, to do next. Meyer testified that he believed probable cause existed to request a search warrant but that Erskine wanted to contact Erritt before proceeding. Erskine placed the call and explained the situation to Erritt. She told Erritt that while Meyer had smelled marijuana, she had not. Erritt told them to write up a search warrant application and present it to a magistrate.

As noted above, it is undisputed that neither Meyer nor Erskine had significant experience in preparing search warrant applications. Meyer had not drafted one for approximately five years and Erskine had drafted only one in

her entire career. They ultimately prepared an application and affidavit for Meyer's signature. Def. Ex. A. There is no evidence that Erritt or any other supervisory officer reviewed the materials before they were presented to a state court judicial magistrate.

In his affidavit, Meyer started his description of the interaction with Yorgensen by writing: "When I exited my squad car I observed the male suspect enter the residence and re-exit the residence closing the front door." Def. Ex. A at 3. He then wrote the following sentence: "When making contact with the male subject who was identified as Dennis Yorgensen, I could smell a strong odor of marijuana come from inside the residence and off Mr. Yorgensen." *Id*. This will be referred to herein as the Challenged Sentence. The affidavit did not state that Erskine was also present during the interaction and, therefore, did not disclose that she did not detect the odor of marijuana. *Id.* Nor did the affidavit disclose that Meyer was still on the public sidewalk, at least 20 feet from the door to unit four, when he allegedly smelled a "strong odor" of marijuana emanating from both Yorgensen and the apartment. *Id*. Based on the information presented, the state court magistrate issued a warrant to search Yorgensen's residence. *Id*. at 11-12.

Because of another call in a different part of Sac County, law enforcement did not execute the warrant at unit four until approximately 3:30 a.m. – nearly five hours after the initial encounter with Yorgensen. Def. Ex. C. When the warrant was executed, only Yorgensen and his wife were present and it appeared that Yorgensen had been sleeping. Neither Meyer nor Erskine detected the odor of marijuana during the search. However, the search uncovered marijuana, methamphetamine, drug paraphernalia and over $2,700 in cash. Yorgensen was arrested and transported to the Sac County Jail.

### D. The Interview

On March 24, 2015, after Yorgensen had been in custody for two days, Erritt called DNE Agent Robert Jones and told him Yorgensen wanted to talk to him. Jones then went to the Sac County Jail and interviewed Yorgensen. The entire interview was videotaped and has been received into evidence. Def. Ex. F.

At the beginning of the interview, Yorgensen asked Jones if it was true that he was going to face federal charges. When Jones confirmed this, Yorgensen began requesting information about the investigation. Jones told Yorgensen that he could not talk to him unless Yorgensen agreed to waive his *Miranda* rights. As the discussion continued, Yorgensen made two comments to the effect that he was thinking he needed a lawyer. Jones told Yorgensen that if he wanted a lawyer, he would get him a lawyer. However, Jones also reiterated that if Yorgensen requested a lawyer, Jones would not be able to talk to him. Ultimately, Yorgensen stated that he understood his rights and signed a *Miranda* waiver. Jones then conducted an interview, during which Yorgensen made incriminating statements.

Report and Recommendation at 2-7. Upon review of the record, I adopt all of Judge Strand's factual findings.

## II.    LEGAL ANALYSIS

### A.    Standards Of Review

I review the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the

10

> court may accept, reject, or modify, in whole or in part, the
> findings or recommendations made by the magistrate judge.
> The judge may also receive further evidence or recommit the
> matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1); *see* FED. R. CIV. P. 72(b) (stating identical requirements); N.D.

IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but

not articulating any standards to review the magistrate judge's report and

recommendation). While examining these statutory standards, the United States Supreme

Court explained:

> Any party that desires plenary consideration by the Article III
> judge of any issue need only ask. Moreover, while the statute
> does not require the judge to review an issue *de novo* if no
> objections are filed, it does not preclude further review by the
> district judge, sua sponte or at the request of a party, under a
> *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review *de novo*

any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party

files an objection to the magistrate judge's report and recommendation, however, the

district court *must* "make a *de novo* determination of those portions of the report or

specified proposed findings or recommendations to which objection is made." 28 U.S.C.

§ 636(b)(1). In the absence of an objection, the district court is not required "to give any

more consideration to the magistrate's report than the court considers appropriate."

*Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing

court to make an "independent review" of the entire matter. *Salve Regina College v.*

*Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled,

no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19

(2004) (noting *de novo* review is "distinct from any form of deferential review"). The

*de novo* review of a magistrate judge's report and recommendation, however, only means

a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's required *de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has been willing to "liberally construe[]" otherwise general pro se objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to me that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, I will strive to provide

*de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). I am unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a

definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads me to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, I believe one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and I may choose to apply a less deferential standard.[1]

---

[1]The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain

As noted above, both the prosecution and Yorgensen have filed objections to Judge Strand's Report and Recommendation. I, therefore, undertake the necessary review of Judge Strand's recommended disposition of Yorgensen's Motion for *Franks* Hearing and Motion to Suppress.

### B.    The Prosecution's Objection

The prosecution does not object to Judge Strand's recommendation to suppress the evidence obtained from the search of Yorgensen's apartment. The prosecution, however, does object to Judge Strand's recommendation to suppress Yorgensen's post-arrest statements as the fruit of the prior illegal arrest. The prosecution argues that Yorgensen's

---

error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will not result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed de novo, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g., United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

statements were voluntary and sufficiently attenuated from the search that suppression of those statements is not appropriate.

Because Judge Strand concluded that the search warrant was unlawful, Yorgensen's arrest was likewise unlawful since it is undisputed that it was based on evidence gathered during the search. Evidence that is the "fruit" of an illegal search or seizure is not admissible, and "[t]he exclusionary prohibition extends as well to the indirect as the direct products of such invasions." *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). "Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search." *United States v. Yousif*, 308 F.3d 820, 827 (8th Cir. 2002) (citing *Wong Sun*, 371 U.S. at 485 ("the Fourth Amendment may protect against the overhearing of verbal statements as well as against the more traditional seizure of 'papers and effects' ")). Therefore, "[s]tatements that result from an illegal detention are not admissible." *United States v. Hernandez–Hernandez*, 384 F.3d 562, 565 (8th Cir. 2004); *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir.1994)). To break the causal chain between an illegal arrest and a statement given later, the statement must be "'sufficiently an act of free will to purge the primary taint.'" *Ramos*, 42 F.3d at 1164 (quoting *Wong Sun*, 371 U.S. at 486). In determining whether Yorgensen's post-arrest statement retains the taint of an illegal arrest, I must consider four factors: (1) the giving of *Miranda* warnings; (2) the temporal proximity of the illegality and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *See United States v. Riesselman*, 646 F.3d 1072, 1080 (8th Cir. 2011); *see also United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006); *United States v. Hernandez-Hernandez*, 384 F.3d 562, 565 (8th Cir. 2004); *United States v. Moreno*, 280 F.3d 898, 900 (8th Cir. 2002); *United States v. Tovar*, 687 F.2d 1210, 1215 (8th Cir. 1982) (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)). The

prosecution has the burden of showing that Yorgensen's statements were sufficiently purged of the taint of the previous constitutional violation. *See Riesselman*, 646 F.3d at 1079 (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)).

### 1. *Miranda warnings*

The prosecution argues that the giving of *Miranda* warnings to Yorgensen weighs in favor of a finding of attenuation and that Judge Strand erred in giving this factor no weight in its favor. Judge Strand never stated that he was giving this factor no weight and did consider this factor in his analysis. Judge Strand correctly noted that the mere fact that Yorgensen was given *Miranda* warnings "did not purge the taint of the illegal search." Report and Recommendation at 21. The United States Supreme Court has never "allowed *Miranda* warnings alone to serve talismanically to purge the taint of prior illegalities." *Oregon v. Elstad*, 470 U.S. 298, 337 (1985); *see Hernandez-Hernandez*, 384 F.3d at 565 ("'The giving of Miranda warnings, followed by the making of a voluntary statement, does not, in and of itself, mandate a statement's admissibility.'") (quoting *United States v. Ramos*, 42 F.3d 1160, 1164 (8th Cir.1994)); *see United States v. Santa*, 236 F.3d 662, 678 (11th Cir. 2000) ("Miranda warnings do not, *without more*, dissipate the taint of an illegal seizure.") (emphasis in original). As Justice Marshall pointed out over a quarter of a century ago:

> this Court firmly established that the fact that the confession may be "voluntary" for purposes of the Fifth Amendment, in the sense that *Miranda* warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest. In this situation, a finding of "voluntariness" for purposes of the Fifth Amendment is merely a threshold requirement for Fourth Amendment analysis. *See Dunaway v. New York*, supra, at 217, 99 S. Ct., at 2259. The reason for this approach is clear: "[t]he exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth"

> Amendment. *Brown v. Illinois*, 422 U.S., at 601, 95 S. Ct.,
> at 2260. If *Miranda* warnings were viewed as a talisman that
> cured all Fourth Amendment violations, then the
> constitutional guarantee against unlawful searches and
> seizures would be reduced to a mere " 'form of words.'" *Id.*,
> at 603, 95 S. Ct., at 2261 (quoting *Mapp v. Ohio*, 367 U.S.
> 643, 648, 81 S. Ct. 1684, 1687, 6 L. Ed.2d 1081 (1961)).

*Taylor v. Austin*, 457 U.S. 687, 690 (1982). Accordingly, the fact that a *Miranda* warning was given to Yorgensen weighs in favor of admission of Yorgensen's statements but it, standing alone, did not purge the taint of the unlawful conduct. *See Santa*, 236 F.3d at 678. I turn to the remaining three factors. *See Brown*, 422 U.S. at 603–04.

### 2.    *Temporal proximity*

Judge Strand found that that the passage of two days, during which Yorgensen was continuously detained due to an unlawful search, did not dissipate the taint of the Fourth Amendment violation. The prosecution contends that Judge Strand erred in his conclusion and that I should find that the passage of two days dissipated the taint of the illegal search. In particular, the prosecution objects to Judge Strand's statement that: "The fact that Yorgensen spent two days in custody is simply irrelevant to the analysis." Report and Recommendation at 21.

Judge Strand explained, in his order denying the prosecution's Motion to Reconsider, that while the quoted sentence was "poorly phrased":

> I did not mean to suggest that the passage of time is not a
> relevant factor. Indeed, as noted above, it is one of the four
> "attenuation" factors. My intent was to communicate my
> finding, in this particular case, that the two days Yorgensen
> spent in custody did not change the fact that his statements
> were a direct result of an illegal search and seizure.

Order on Motion to Reconsider at 4 n.3. The point that Judge Strand makes is a valid one. Although I recognize the fact Yorgensen's statement was given two days after his

illegal arrest gave Yorgensen time to contemplate his situation, this two-day period of incarceration cuts against Yorgensen's statement being of free will and constitutes a more serious violation than the initial illegal arrest. *See Dunaway v. New York*, 442 U.S. 200, 220 (1979) (Stevens, J., concurring) ("If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one."). As Judge Bye observed in a concurring opinion, "'where no intervening circumstances are present, a long and illegal detention may in itself impel the defendant to confess.'" *United States v. Vega-Rico*, 417 F.3d 975, 980 (8th Cir. 2005) (Bye, J., concurring) (quoting *People v. White*, 117 Ill.2d 194, 111 Ill. Dec. 288, 512 N.E.2d 677, 688 (1987)). Accordingly, I agree with Judge Strand that that the passage of two days, during which Yorgensen was continuously detained due to an unlawful search, did not dissipate the taint of his illegal arrest.

### 3. *Presence of intervening circumstances*

The prosecution also object to Judge Strand's conclusion that there were no intervening circumstances weighing in favor of attenuation. Specifically, the prosecution argues that Yorgensen initiated the conversation at issue here. The flaw in the prosecution's argument is that it failed to establish this fact at the evidentiary hearing.

Judge Strand found that "Erritt called DNE Agent Robert Jones and told him Yorgensen wanted to talk to him." Report and Recommendation at 7. Jones testified about two calls he received from Erritt. Following Yorgensen's arrest, Erritt called Jones and asked if he wanted to interview Yorgensen. After Jones declined, Erritt stated that he would interview Yorgensen himself. Jones then received a second call from Erritt during which Erritt stated that Yorgensen had asked to speak to Jones by name. Jones, however, also testified that he never previously met Yorgensen. Erritt did not testify. Based on this record, Judge Strand could not find that Jones's interview of Yorgensen

was at Yorgensen's request. As Judge Strand explained, in his order denying the prosecution's Motion to Reconsider, that on this record,

> [i]t is at least as likely that Erritt interviewed Yorgensen—as he said he would—warned him about federal charges and persuaded him to talk to Jones. This would explain the unusual manner in which the meeting between Jones and Yorgensen began:
>
> | Jones: | How's it going? |
> |---|---|
> | Yorgensen: | Not too bad. How are you doing? Jones: Good. I'm Bob Jones. I hear ya—you wanted to talk. |
> | Yorgensen: | Uh, I don't understand what they're, what they're putting me on, on federal. Doing what, what, I don't understand this. |
> | Jones: | Right. |
> | Yorgensen: | Um, now, uh, I mean, I heard that, uh, you needed to talk to me. |
> | Jones: | No, not really. |

Order on Motion to Reconsider at 4 n.3 (footnote omitted).

The prosecution contends that Yorgensen did not say, "Um, now, uh, I mean, I heard that, uh, you needed to talk to me" but rather "you need to talk to me." Prosecution's Obj. at 15. The prosecution argues that Yorgensen's statement reflected his desire to know about the federal charges he was facing rather than his understanding that Jones had asked to talk to him. From my review of the recording, I agree with Judge Strand that Yorgensen states: "I heard that, uh, you needed to talk to me." Because the prosecution did not call Erritt to testify, it has failed to prove that Yorgensen made an unsolicited request to speak with Jones. There is no evidence in the record suggesting

that Yorgensen would have spoken with Jones but for the fact that he was jailed after an illegal arrest.

The situation here is distinguishable, and more aggravating, than that in *Vega-Rico*, a prosecution cited authority. In *Vega-Rico*, "[t]he interview was conducted for purposes unrelated to the circumstances surrounding the Fourth Amendment violation," and "[t]he interview was conducted in a different city by an agent from a separate law enforcement agency, and neither agent nor agency had any involvement in the initial Fourth Amendment violation." *Vega-Rico*, 417 F.3d at 980. Here, in contrast, Yorgensen was in custody as a result of an illegal arrest during the entire two-day period and was then interviewed about the same subject as his arrest, drug trafficking. Moreover, unlike the defendant in *Vega-Rico,* Yorgensen was not transferred to the custody of another agency before the interview occurred. Accordingly, I concur with Judge Strand's finding of no intervening circumstances.

### 4. *Purpose and flagrancy of official misconduct*

Finally, the prosecution objects to Judge Strand's finding that the final factor, purpose and flagrancy of the official misconduct, does not weigh in favor of attenuation. The prosecution contends that neither Meyer nor Jones acted in a way to constitute "purposeful or flagrant misconduct." This factor is the "most important factor because it is directly tied to the purpose of the exclusionary rule-deterring police misconduct." *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006); *see United States v. Faulkner*, 636 F.3d 1009, 1016 (8th Cir. 2011) (same). As the Eighth Circuit has noted, courts will find "purposeful or flagrant conduct where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed "in the hope that something might turn up." *Simpson*, 439 F.3d at 496 (citations omitted). In his Report and Recommendation,

Judge Strand found that Meyer acted with reckless disregard for the truth by applying for a search warrant with an affidavit that contained an untrue statement and several material omissions. The Supreme Court has instructed:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, *reckless*, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.

*Herring v. United States*, 555 U.S. 135, 144 (2009) (emphasis added).

Meyer's violation of Yorgensen's rights was not accidental. The prosecution does not object to Judge Strand's finding that Meyer acted with reckless disregard for the truth. As a result, the exclusion of Yorgensen's statements may deter reckless police conduct in the future. *See Herring*, 555 U.S. at 144. On the other hand, permitting the prosecution to use Yorgensen's statements, while not having any deterrent effect on reckless police practices, might encourage similar reckless police activities in the future. Accordingly, I agree with Judge Strand's finding that this factor also does not weigh in favor of attenuation and that the illegality was not sufficiently attenuated to purge its taint. The prosecution's objection is overruled.


### C.    *Yorgensen's Objection*

Yorgensen objects to Judge Strand's alternative ruling that Yorgensen's statements were not obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Yorgensen contends that he unequivocally invoked his right to counsel and, thus, his incriminating statements must be suppressed.

Under *Miranda*, a person in police custody must be advised as follows:

> He must be warned prior to any questioning that he has the
> right to remain silent, that anything he says can be used
> against him in a court of law, that he has the right to the
> presence of an attorney, and that if he cannot afford an
> attorney one will be appointed for him prior to any
> questioning if he so desires.

*Miranda*, 384 U.S. at 479. If a person requests an attorney, then questioning must cease until a lawyer has been made available or that person initiates the conversation. *Dormire v. Wilkinson*, 249 F.3d 801, 804 (8th Cir. 2001) (citing *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)). However, "[o]fficers are only required to cease questioning if a suspect's request for an attorney is clear and unambiguous." *United States v. Mohr*, 772 F.3d 1143, 1145 (8th Cir. 2014); *United States v. Cloud*, 594 F.3d 1042, 1046 (8th Cir. 2010); *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003). Police are permitted to ask clarifying questions if there is an ambiguous request for an attorney. *Davis v. United States*, 512 U.S. 452, 459-61 (1994).

Judge Strand found that the following pre-*Miranda* warning conversation between Yorgensen and Jones occurred:

| Jones: | Here's what we'll do if you want to and like I said whenever you want to you can say hey, I want to go back to my cell. Okay, we're not holding you here, I'm not … you know, okay? |
|---|---|
| Yorgensen: | Right, right, right, right. |
| Jones: | Here's what we'll do. I'm going to go ahead and *Mirandize* you, okay 'cuz I need . . . I need to make sure you fully understand your rights. |
| Yorgensen: | I think [unintelligible] I do need a lawyer. |
| Jones: | Okay, that … that's cool. If you … you . . . |
| Yorgensen: | I mean you're getting to this point man. I'm thinking … I'm thinking I really need a lawyer. |

| Jones: | Then if you're saying if you want if listen, if you're saying you want a lawyer then I can't talk to you. |
|---|---|
| Yorgensen: | Oh, okay. Well then |
| Jones: | But I'm not, listen … listen … listen, I'm not trying to change your mind on that. If you want a lawyer, we'll get you a lawyer. |
| Yorgensen: | But like you said, I can always . . . I can always quit talking. |
| Jones: | Exactly. |
| Yorgensen: | No, let's see what you got. |

Report and Recommendation at 23-24. Yorgensen does not object to this factual finding. After this conversation occurred, Jones read Yorgensen his *Miranda* rights and Yorgensen confirmed that he understood them. Yorgensen also signed a written waiver of those rights. Jones then conducted an interview of Yorgensen.

Yorgensen contends that his two comments about a lawyer, "I think . . . I do need a lawyer" and "I'm thinking I really need a lawyer", both constituted unequivocal requests for counsel. Judge Strand, however, found that "Yorgensen failed to express a clear and unequivocal request for counsel." Report and Recommendation at 24. I likewise conclude that Yorgensen did not make a clear and unequivocal request for counsel. Instead of stating in clear and certain terms that he wanted a lawyer, Yorgensen told Jones that he was "thinking" he needed a lawyer.

In *Davis*, the Supreme Court found that the phrase "[m]aybe I should talk to a lawyer" was ambiguous, and, therefore, the police were not required to cease questioning. *Davis*, 512 U.S. at 462. In this case, Yorgensen's statements differ only in the qualifying clauses—"I think" and I'm thinking" instead of "maybe I should." Both phrases are equivocal to some degree.

Federal courts of appeals that have considered a suspect's statement containing the words "I think" have reached different conclusions. In a pre-*Davis* decision cited and relied upon by Yorgensen, the Eleventh Circuit Court of Appeals assumed without analysis that the statement "I think I should call my lawyer" was an unequivocal request for counsel. *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991). Similarly, in a pre-*Davis* decision, the Fifth Circuit Court of Appeals found that the phrase "I think I want to talk to a lawyer" was an unequivocal request for counsel. *United States v. Perkins*, 608 F.2d 1064, 1066 (5th Cir. 1979).

On the other hand, three circuits that have considered similar language post-*Davis* found that there was no unequivocal request for counsel. The Second Circuit Court of Appeals found a suspect's statement "[d]o you think I need a lawyer" was ambiguous within the meaning of *Davis*. *Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir. 1996). The statement in this case is more emphatic than the one considered in *Diaz*, in that it is not in the form of a question. In *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000), the Fourth Circuit Court of Appeal considered the statement "I think I need a lawyer." The court held that "[t]his statement does not constitute an unequivocal request for counsel. In fact, Burket's statement is quite similar to the defendant's statement in *Davis* ('Maybe I should talk to a lawyer'), which the Supreme Court found ambiguous." *Id*. at 198. Yorgensen's statements, here, are nearly identical to the one at issue in *Burket*. More recently, the Sixth Circuit Court of Appeals determined that the Ohio Supreme Court's conclusion that an arrestee did not unambiguously invoke his right to counsel by stating to police officers, "I think I need a lawyer," was not unreasonable application of federal law, and, thus, the arrestee was not entitled to habeas relief on ground that the police obtained a statement from him in violation of his Fifth Amendment rights. *Henness v. Bagley*, 644 Fed. App'x 308, 319 (6th Cir. 2011). Moreover, Yorgensen's statements are similar to other statements found to be ambiguous. *United States v. Zamora*, 222

F.3d 756, 765–66 (10th Cir.2000) ("I might want to talk to an attorney."); *Mueller v. Angelone*, 181 F.3d 557, 573–74 (4th Cir. 1999) ("Do you think I need an attorney here?"); *Ledbetter v. Edwards*, 35 F.3d 1062, 1069–70 (6th Cir. 1994) ("it would be nice" to have an attorney); *United States v. Fouche*, 776 F.2d 1398, 1405 (9th Cir. 1985) ("I might want to talk to a lawyer"). In comparison to *Davis* and its progeny, both of Yorgensen's statements are ambiguous requests for counsel. Neither clearly indicates that Yorgensen would only deal with the police with counsel present. Both contain the ambiguous phase, "I think," as opposed to more declarative statements. Accordingly, I find that Yorgensen's requests are not unambiguous and, thus, were not obtained in violation of his Fifth Amendment right to counsel. Accordingly, Yorgensen's objection to Judge Strand's alternative holding is overruled.

## III.   CONCLUSION

Therefore, for the reasons discussed above, I, upon a *de novo* review of the record, accept Judge Strand's Report and Recommendation and grant defendant Yorgensen's Motion to Suppress. Accordingly, all evidence gathered during the execution of the search warrant at issue and Yorgensen's post-arrest statements are suppressed.

**IT IS SO ORDERED**.

**DATED** this 7th day of December, 2015.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA